UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BOOMER'S NEIGHBORHOOD
GRILL & BAR INC. D/B/A KGA,
INC.,

  Plaintiff,

v.

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY,

  Defendant.

Case No.: 2:23-cv-1004-JES-NPM

## **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, BOOMER'S NEIGHBORHOOD GRILL & BAR, INC. d/b/a KGA, INC., ("Boomer's") by and through undersigned counsel, pursuant to Rule 56, Federal Rules of Civil Procedure, and moves for Partial Summary Judgment. In support thereof, Boomer's states:

### **Statement of Undisputed Facts**

1. On September 30, 2022, Boomer's reported a claim as a result of a loss to the insured building located at 2360 Tamiami Trail, Port Charlotte, Florida 33952, caused by Hurricane Ian, under policy number FSF16026323 002. **See April 17, 2023 Claim Correspondence attached as Exhibit A.**

2. Westchester assigned claim number KY22K2898390. **Id.**

3. Westchester completed its "factual investigation" on April 22, 2023, and agreed that Boomer's suffered a covered loss caused by Hurricane Ian. **Id.**

4. On October 19, 2022, Dan Evans, the field adjuster hired by Westchester drafted a report regarding his inspection and recommendations for coverage. This included the task of creating a "valuation" for the building insured by Westchester.

5. On October 19, 2022, Joseph Shaub, Executive General Adjuster and Dan Evans emailed the initial copy of the report and they were "recommending roof replacement based on what we observed.[1]" **See Exhibit B.**

6. Amy Wissner, Regional General Adjuster requested that an engineer be retained to "address the pre-existing damage exclusion." **Id.**

7. As a result of the engineer's inspection, Westchester decided to modify the initial opinion of Dan Evans and Joseph Shaub to only cover a repair of the roof. **[ECF Doc 43, Exhibit F]**

8. Dan Evans utilized the "Xactimate" software estimating program to determine the valuation of the building, for purposes of assessing the applicability of a "co-insurance penalty" was $1,078,750.66 for the Replacement Cost Value (RCV) and $614,993.46 Actual Cash Value (ACV).

---

[1] Westchester did not agree to replacement of the roof because it hired an engineer that opined that the roof could be repaired. The appraisal panel awarded a full roof replacement. In addition, Dan Evans testified and indicated in his fourth report that once he consulted with two commercial roofers, both indicated that a repair was not appropriate for this loss.

**See [ECF Doc 43, Exhibit F, pg. 149 of 207]; Dan Evans Deposition**

**Transcript 9-13.**

9.  On February 1, 2023, Amy Wissner, Regional General Adjuster for

Westchester sent an email explaining how Westchester was applying the

co-insurance penalty. In relevant part Ms. Wissner advised that:

Coinsurance

A coinsurance percentage of 80% is shown in the Declarations of your policy
and as such the following condition applies: We will not pay the full amount
of any loss, if the value of Covered Property at the time of loss, times the
Coinsurance percentage shown for it in the Declarations, is greater than the
Limit of Insurance for the property.  To calculate this we start with the Total
Valuation ($1,078,750.66) of the property, less site work/foundation
($231,138.66), which gives us the Net Valuation ($847,612.00).  Next we take
that Net Valuation ($847,612.00) and multiply it by the 90% coinsurance
requirement ($762,850.80) to see if the insured amount of the Building
($700,000) meets or exceeds the 90% coinsurance requirement ($762,850.80).
If it falls below the 90% minimum then a coinsurance penalty applies.  To
determine the most we will pay when there is a coinsurance penalty, we use
the following steps:

(1)  Multiply the value of Net Valuation at the time of loss by the
Coinsurance percentage ($847,612.00 x 90% = $762,850.80)
(2)  Divide the Limit of Insurance of the property by the figure
determined in Step (1)  ($700,000.00 / $762,850.80 =  0.824)
(3)  Multiply the total amount of loss, before the application of any
deductible, by the figure determined in Step (2)  ($103,654.74 x 0.824
= $95,113.57)

This final figure in Step (3), or the Limit of Insurance, whichever is less,
becomes the total covered damage amount from which the deductible and
any deprecation are then deducted. **[ECF Doc. 43, Exhibit F.]**

10. Noticeably absent from the explanation is any reference to the actual language in the insurance policy that dictates and otherwise controls the proper valuation of a building for purposes of applying the coinsurance penalty.

11. The insurance policy in effect on the date of the loss includes the following relevant provisions that control the valuation of the property for purposes of applying the co-insurance penalty analysis:

The Historic Reproduction Cost Endorsement, Form AWB0210 (10/15) provides in relevant part that:

The following is added to clause **7. Valuation of Section E. Loss Conditions of the CP 00 10 (10/12) Building and Personal Property Coverage Form**:

At the time and place where the loss or damage occurs, the property described in the schedule above will be valued at "Actual Cash Value" unless the property meets the definition of a "Historic Property or is considered to have "Historic Value".

       *                 *                 *

The following definitions are added to **SECTION H - DEFINITIONS**:

"Actual Cash Value" means the cost to replace or rebuild the property less normal depreciation for age, use, occupancy or the condition of the property prior to the loss or damage occurrence.

"Historic Property" means any property listed in a Federal, State, County or Municipal Historic Register. "Historic Property" shall also mean any property constructed or produced prior to the year 1940 if it has "Historic Value" to the community in which it is situated.

*                         *                         *

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

> a. At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

**Page 12 of 16, CP 00 10 10 12**

*                         *                         *

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

> **1. Coinsurance**
>
> If a Coinsurance percentage is shown in the Declarations, the following condition applies:
>
> a. We will not pay the full amount of any loss **if the value of Covered Property at the time of loss** times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

(Emphasis added).

**Page 13 of 16, CP 00 10 10 12.**

**[ECF Doc 43, Exhibit A, *See also* ECF Doc 45 affirmative defenses 3 and 14]**

12. The property was constructed in 1982 and Westchester has not asserted that it qualifies as "Historic Property." **[ECF Doc. 43, Exhibit E, pg. 125 of 207].**

13. Boomer's thereafter retained counsel and submitted its own estimate for necessary repairs to the property by way of serving Westchester with a Notice of Intent to Initiate Litigation ("NOITL") on June 19, 2023. A copy of the Boomer's estimated cost of repairs pertaining to the same damages that had previously been presented to Westchester in the initial inspection was attached. **[ECF Doc 3, Exhibit C].**

14. Boomer's invoked appraisal and also expressly disputed the manner in which the building was valued for purposes of applying a "co-insurance" penalty. **See [ECF Doc. 43, Exhibit C].**

15. On June 30, 2023, Attorney Pasternak responded on behalf of Westchester wherein he requested a reinspection of the property and claimed that Westchester had not "made a coverage determination claimed in the CBSS Inc. estimate." Westchester claimed that Boomer's could not make a written invocation of appraisal provision within the NOITL form that was served on Westchester. This statement conflicts with the appraisal clause, as the policy merely requires that a party "make a written demand for an appraisal of the loss." **[ECF Doc. 43, Exhibit D].**

16. Attorney Pasternak then made an offer as required by Section 627.70152, Florida Statute, "to comply with Section 627.70152 . . . ". **Id.**

17. Boomer's coordinated the requested reinspection and allowed access to the property and following the secondary inspection, On August 22, 2023, Boomer's once again invoked its right to resolve the claim through the appraisal process. **[ECF Doc 3, Exhibit C].**

18. On August 30, 2023, Westchester asserted in a written correspondence to its insured's attorney that it was, "finishing up our review of your claim submission and will be issuing a supplemental payment shortly." **See Exhibit C.**

19. On September 19, 2023, a supplemental payment appeared at Boomer's attorney's office – nearly one year after the occurrence of Hurricane Ian – however it was only about 30% of the demanded amount of loss. **[ECF Doc. 43, Exhibit D].**

20. Due to Westchester's failure to respond to Boomer's second invocation of appraisal on August 22, 2023, on October 6, 2023, Boomer's filed a two-count complaint seeking judgment against Westchester for breach of contract for failing to appoint an appraiser and engage in appraisal pursuant to the insurance policy and specific performance of the appraisal provision. **[ECF Doc. 43, Exhibit C].**

21. On October 16, 2023, Attorney Pasternak authored correspondence on behalf of Westchester wherein it admitted that it was served with a lawsuit

on October 10, 2023, and in response it finally appointed an appraiser in response to Boomer's two prior invocations of appraisal and the lawsuit that prompted Westchester's compliance with the appraisal provision. **See Exhibit D.**

22. The parties agreed to a joint motion to engage in appraisal that this Court entered on June 25, 2024. **[ECF No. 26].**

23. On October 30, 2024, Westchester had to pay Boomer's an additional $212,379.59 in unpaid benefits. As part of the explanation of payment Westchester withheld $37,345.64 as a "co-insurance" penalty based on the RCV valuation generated by Dan Evans using Xactimate software. **See [ECF Doc. 43, Exhibit G.]**

24. On March 18, 2025, Boomer's filed an amended complaint alleging additional breaches of contract due to the gross under adjustment of the loss now established by the entry of the appraisal award and also as a result of improperly assessing a coinsurance penalty due to an improper valuation of the building at RCV instead of at the ACV as required by Westchester's policy of insurance. **[ECF Doc. 43]**

25. On April 1, 2025, Westchester filed its Answer and Affirmative Defenses. **[ECF Doc. 45]**. The following Affirmative Defenses when taken together support Boomer's Motion for Summary Judgment.

## **Third Affirmative Defense**

Coverage under the Policy is barred, in whole or in part, by the following policy provision:

1. Coinsurance If a Coinsurance percentage is shown in the Declarations, the following condition applies:

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property. Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3). We will pay the amount determined in Step (4) or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

\*                    \*                    \*

## **Fourteenth Affirmative Defense**

Coverage under the Policy is barred, in whole or in part, by the following policy provision:

### **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

7. Valuation We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d., and e. below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

26. On May 8, 2025, Westchester served its verified response to Plaintiff's First

Set of Interrogatories and provided the following sworn testimony:

7. For each pled affirmative defense please specifically describe and list each witness or person with personal knowledge of the factual basis for each defense, list and specifically describe the factual basis that each witness or person with personal knowledge that Defendant will present to provide the pled defense, identify and list every document, photograph, tangible or electronically stored date that the Defendant relies upon to plead or that it will rely on to prove the pled defense, and identify with specificity any and all documents, photographs, or electronically stored data that Defendant reviewed or relied upon to answer this interrogatory.

**ANSWER:** Westchester's corporate representative(s) have knowledge and can testify as to the affirmative defenses pled in the Answer and Affirmative Defenses. Additionally, Dan Evans from Crawford has knowledge and can testify as to the coinsurance penalty that was applied. Westchester reserves the right to amend and/or supplement this response as discovery is ongoing.

**See Exhibit E.**

27. On May 13, 2025, Dan Evans was deposed by Boomer's and asked about

his knowledge as to the coinsurance penalty that was applied. Dan Evans

testified in relevant part:

Dan Evans Deposition Transcript Pg. 146

10    Q.   You would have to factor in the value of the

11 property in its current condition when the claim occurs?
12     MR. GARRIDO:  Object to form.
13     THE WITNESS:  (No verbal response.)
14     BY MR. MILLARD:
15   Q.  Is that a -- is that a yes?
16   A.  I'm sorry.  That I would have to value the
17 property at -- I'm sorry, please repeat.
18   Q.  Yeah.  When you value -- when you come up with
19 a valuation of the property, the Policy says, "We will
20 not pay the full amount of any loss if," and then it
21 says, "the value of covered property at the time of loss
22 times the co-insurance percentage shown for it in
23 Declarations is greater than the limit of insurance for
24 the property."  So you've got several things that you
25 have to consider to determine if the co-insurance

Dan Evans Deposition Transcript Pg. 147

1 penalty applies.  The first, you have to figure out the
2 value of covered property at the time of loss.  That's
3 the first thing you have to figure out based on what the
4 policy says, correct?
5   A.  Yes.

Dan Evans Deposition Transcript Pg. 148.

1   Q.  I get it.  One of your valuations was
2 replacement cost value?
3   A.  Correct.
4   Q.  The other valuation was actual cash value?
5   A.  Correct.
6   Q.  And those are stated in your report, right?
7   A.  It's our valuation, correct.
8   Q.  Okay.  And just so we're clear, I'm going back
9 to Plaintiff's 2, and I'm on Page 8 of 61 of what's been
10 marked as Plaintiff's 2.  And on Page 8, you have
11 "Estimated Replacement Cost" and "Actual Cash Value" for
12 the valuation of the building.
13   A.  Correct.
14   Q.  And the value of the building on the date of

15 loss, factoring in its age and condition, would be the
16 actual cash value amount of $614,993.46, correct?
17 MR. GARRIDO:  Object to form.
18 THE WITNESS:  Yes.

Deposition Transcript of Dan Evans, Pg. 152

2    Q.  I'm sorry, sir.  But do you see the document
3 on the share screen?
4    A.  I see the valuation.
5    Q.  Okay.  The top -- so on Page 8 of 61, what's
6 been marked as Plaintiff's 2 –
7    A.  That was the -- that estimated replacement 8 cost, and it was –
9    Q.  Sir, let me finish my question before you 10 start talking, please.
   And listen closely, sir.
11    A.  Okay.
12    Q.  This isn't that hard.  I mean, we've all –
13 you -- to a certain degree, you've already agreed to
14 some of this stuff.  So I'm just trying to understand
15 what the -- what the -- what the difficulty is.  But
16 let's just -- let's look at what's on the screen.  When
17 you created the valuation of the building, the valuation
18 you provided to Westchester included two different
19 valuations.  The first valuation was the replacement
20 cost value.  The second valuation, appearing just below
21 that, was the actual cash value.  Do you see that?
22    A.  Those are the two values provided.  Yes.
23    Q.  Right.  And then in parentheses, it said,
24 "(Replacement cost includes all applicable permit fees,
25 overhead, profit, and sales tax)," right?

Deposition Transcript of Dan Evans, Pg. 153

1    A.  Yes.
2    Q.  And you would have to do the work to know what
3 that would cost and to recover it under a -- under
4 Replacement Cost Value, correct?
5    A.  Yes.
6    Q.  Okay.  So the replacement cost value would
7 contemplate that all of the repairs for the building to

8 create it back with all the properly considered
9 valuation points on a replacement cost value basis would
10 be $1,078,750.66?  $1,078,750.66.  That's the amount you
11 factored in to -- if you had to pull all the permits and
12 you incurred overhead and profit and the sales tax, and
13 buying all brand new materials and built this building
14 back, that's how much the system determined or that you,
15 using the system, determined the replacement cost value
16 of the Boomer's building would cost, right?
17    A.  Xactimate generated that number, yes.
18    Q.  I understand that.
19    A.  Okay.  So –
20    Q.  And Xactimate, based on the information you
21 input, also determined that on the date of loss, before
22 you've done all the repairs, bought new materials, and
23 incurred permitting fees, overhead and profit, et
24 cetera, et cetera, on the date of the loss and in the
25 condition you observed the building, the actual cash

Deposition Transcript of Dan Evans, Pg. 154

1 value, when you factor in actual cash value equals
2 replacement cost less depreciation, so you depreciate
3 the replacement cost to factor in what the value of the
4 building was on the date of the loss, that amount that
5 you included in your Report is $614,993.46, correct?
6    A.  That's what the system generated, correct.
7    Q.  Okay.  And so on -- the value of covered
8 property at the time of the loss was $614,993.46,
9 correct?
10      MR. GARRIDO:  Object to form.
11      THE WITNESS:  That is the actual cash value
12   based on the age, based on the input to the
13   estimating valuation tool.

**The entire transcript was filed in the record on 5/30/2025. The relevant excerpt is attached as Exhibit F.**

<u>**Memorandum of Law**</u>

**I.     Standard for Summary Judgment**

The question for determination on a Motion for Summary Judgment is the existence or non-existence of a material, factual issue.  The Federal Rules of Civil Procedure provide that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those materials that demonstrate the absence of a genuine issue of material fact.  *See Siemens Power Transmission & Dist. v. Norfolk S. Ry. Co.*, 336 F.Supp. 2d 1201, 1207 (M.D. Fla. 2004), citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Once the movant satisfies this requirement, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial."  *Id.*, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 (1986).  To meet this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings."  *Id.*  Nor may the non-moving party rely on a mere scintilla of evidence supporting its position. *Id.*, citing *Walker v.*

*Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Rather, for a court to find a genuine issue for trial, the non-moving party must establish, through the record presented to the court, that it is capable of providing evidence sufficient for a reasonable jury to return a verdict in its favor. *Id.*, citing *Cohen v. Am. Bank*, 83 F.3d 1347, 1349 (11th Cir. 1996).

In this case, jurisdiction is based on diversity of citizenship. Therefore, the Court is duty-bound to apply the law of Florida to the interpretation of the Scottsdale policy. See *United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005).

## II. Applicable Law on Policy Interpretation

"It has long been a tenet of Florida insurance law that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer." *Berkshire Life Ins. Co. v. Adelberg,* 698 So. 2d 828, 830 (Fla. 1997). In other words, "where policy terms are undefined, they are to be given their plain and ordinary meaning as understood by the average person." *Id.* at 830.

The scope and intent of insurance coverage is defined by the language and terms of the policy. "In construing an insurance policy, the court should read the policy as a whole, giving every provision its full meaning and operative effect." *Roberts v. Florida Lawyers Mutual Insurance Co.*, 839 So. 2d 843, 845 (Fla. 4th DCA 2003). "When 'interpreting an insurance contract,' this Court is 'bound

by the plain meaning of the contract's text.'" *Geico Gen. Ins. Co. v. Virtual Imaging Servs., Inc.*, 141 So. 3d 147, 157 (Fla. 2013) (quoting *State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So. 3d 566, 569 (Fla. 2011)). "If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written." *Id.* (quoting *Menendez*, 70 So. 3d at 569-70).

III.    **Westchester breached the Valuation provision and the Coinsurance provision because it utilized the Replacement Cost Value of Boomer's building instead of the Actual Cash Value so that it could underpay Boomer's claim by $37,345.64.**

Westchester materially breached the insurance policy by utilizing a Replacement Cost Value calculation to underpay Boomer's claim by $37,345.64. A simple reading of the applicable endorsement and policy provision leads to one simple conclusion – Westchester utilized the Replacement Cost Value calculation as a basis to improperly underpay Boomer's insurance claim without regard for the clear and unambiguous language it wrote into the policy of insurance.

Westchester included an endorsement in the operative policy that expressly stated that "[a]t the time and place where the loss or damage occurs, the property described in the schedule above will be valued at "Actual Cash Value.". . . The Endorsement expressly defined "actual cash value," and it states that, "'Actual Cash Value' means the cost to replace or rebuild the property less normal depreciation for age, use, occupancy or the condition of the property prior to the

loss or damage occurrence." In further clarification of the intended valuation method, the policy expressly required Westchester to value Boomer's property "[a]t the time and place where the loss or damage occurs . . . ".

The policy must be read as a whole. *Roberts*, 839 So. 2d at 845. When taking the language written in the policy for valuation purposes, it is indisputable that a valuation "at the time and where the loss or damage occurs" contemplates valuation at the "actual cash value." Per the policy this valuation method reflects the value of the property "less normal depreciation for age, use, occupancy or the condition of the property prior to the loss or damage occurrence." Otherwise, had Westchester intended to use "replacement cost value" as the method of valuation, it would have expressly written in that the valuation would be based on "replacement cost value." Westchester did not do that and the only reasonable reading of the policy's plain language is that Westchester intended to value to the property on an actual cash value basis at the time of the loss.

This interpretation is further supported by the "Valuation" provision Westchester wrote in the policy. The Valuation provision included within the policy expressly states that, "[w]e will determine the value of Covered Property in the event of loss or damage as follows: At actual cash value as of the time of loss or damage. . . ". It becomes further clarified by the policy that Westchester will value "Covered Property" as "actual cash value as of the time of loss or damage."

This further supports that the intended valuation method for the value of Covered Property at the <u>time of the loss</u> is at an actual cash value basis.

Last, the Coinsurance provision further supports utilizing an actual cash value basis for valuation of the building because the provision expressly included language referring to "**the value of Covered Property at the time of loss.**" Based on the definitions  and prior language discussing "actual cash value" and what this means, per the policy, it becomes clear that Westchester intended to value the "Covered Property" at its actual cash value as that would reflect its value in its condition "at the time of loss." If Westchester intended otherwise, it would have expressly stated so. As a result, there can be no dispute that the applicable policy expressly required Westchester to calculate the value of Boomer's insured property at the "actual cash value," and not the "replacement cost value."

One need only look at Westchester's own affirmative defenses and its staunch refusal to pay anything more than the "Actual Cash Value" of the loss until and unless, Boomer's repairs the property and incurs the full cost of the appraisal award <u>before</u> it would pay the withheld depreciation as further support for Boomer's interpretation of the policy. Westchester cannot have its proverbial "cake and eat to," with the way it reads its policy. If it can avoid paying the Replacement Cost Value until all repairs are performed and the costs of using new materials, labor, permitting, and code compliance are fully incurred, it cannot

claim that the valuation of the building at the "time of the loss" should be considered at Replacement Cost Value, when the policy expressly states that such a valuation must be done at Actual Cash Value. Despite indisputable testimony from Dan Evans himself and the clear language of the policy, Westchester persists on not paying Boomer's what the Policy clearly required it to pay and satisfy its debt to its customer – Boomer's.

The Court need look no further than Westchester's own explanation of how the coinsurance works to determine that the coinsurance penalty indisputably does not apply to Boomer's claim. Amy Wissner explained Westchester's application of the penalty as follows:

Coinsurance

A coinsurance percentage of 80% is shown in the Declarations of your policy and as such the following condition applies: We will not pay the full amount of any loss, if the value of Covered Property at the time of loss, times the Coinsurance percentage shown for it in the Declarations, is greater than the Limit of Insurance for the property. To calculate this we start with the Total Valuation ($1,078,750.66) of the property, less site work/foundation ($231,138.66), which gives us 1the Net Valuation ($847,612.00). Next we take that Net Valuation ($847,612.00) and multiply it by the 90% coinsurance requirement ($762,850.80) to see if the insured amount of the Building ($700,000) meets or exceeds the 90% coinsurance requirement ($762,850.80). If it falls below the 90% minimum then a coinsurance penalty applies. To determine the most we will pay when there is a coinsurance penalty, we use the following steps:

(1)  Multiply the value of Net Valuation at the time of loss by the Coinsurance percentage ($847,612.00 x 90% = $762,850.80)
(2)  Divide the Limit of Insurance of the property by the figure determined in Step (1) ($700,000.00 / $762,850.80 = 0.824)

(3)  Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2)  ($103,654.74 x 0.824 = $95,113.57)

This final figure in Step (3), or the Limit of Insurance, whichever is less, becomes the total covered damage amount from which the deductible and any deprecation are then deducted. **See [ECF Doc. 43, Exhibit F.]**

The numbers were based on calculations from Dan Evans based on his utilization of the Xactimate Software tool provided to him by his employer. When he calculated the valuation, he included both the RCV and ACV calculations as follows:

$1,078,750.66 for the Replacement Cost Value (RCV) and

$614,993.46 Actual Cash Value (ACV).

**See [ECF Doc 43, Exhibit F, pg. 149 of 207]; Dan Evans Deposition Transcript 9-13.**

By using the appropriate figure required by the insurance policy the proper calculation is as follows:

$614,993.46 - $231,138.66 for cite preparation costs = $383,854.80 net valuation.

Take the net valuation, $383,854.80 x 90% = $345,469.32

Divide Limit of insurance by the amount - $700,000/$345,469.32 = more than 90%, thus no penalty is applied.

Therefore, Westchester's application of the coinsurance penalty was in error and in material breach of the Insurance Policy. As such, judgment for Boomer's is

both necessary and proper based upon the indisputable facts and the applicable
policy language cited herein.

**WHEREFORE**, the Plaintiff, BOOMER'S NEIGHBORHOOD GRILL & BAR,
INC. d/b/a KGA, INC., respectfully requests that this Court GRANT its Motion
for Partial Summary Judgment, enter judgment for Boomer's in the amount of
$37,345.64, including an award of interest, costs, and attorney fees, and order any
other relief this Court deems just and proper.

> HABERMEHL MILLARD GOSS LLP
> 385 W. Fairbanks Avenue, Suite 300
> Winter Park, FL 32789
> Telephone: (407) 961-6410
> Facsimile: (407) 627-1718
>
> By:    _/s/ Scott G. Millard_
> **Scott G. Millard, Esq.**
> Fla. Bar No.: 109726

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished to:

> Jaun Garrido, Esq.
> Cozen O'Connor
> jgarrido@cozen.com
> 200 South Biscayne Blvd, Suite 3000
> Miami, FL 33131

By CM/ECF system and via electronic mail May 30, 2025

> /s/ Scott G. Millard
> Scott G. Millard, Esq.

# EXHIBIT

# A

**CHUBB**

Eastern Claim Service Center
600 Independence Parkway
Chesapeake, VA 23327-4700
O    (800) 252-4670
F    (800) 664-5358

Mailing Address
P.O. Box 4700
Chesapeake, VA 23327-4700

April 17, 2023

Boomers Sports Grill & Bar Inc. dba KGA, Inc.
2360 Tamiami Trail
Port Charlotte, FL 33952

Sent via email to: andrewkontos51@gmail.com

RE:    Insured:                Boomers Sports Grill & Bar Inc. dba KGA, Inc.
        Location of Loss:      2360 Tamiami Trail, Port Charlotte, FL 33952
        Nature of Loss:        Hurricane Ian – CAT 2261
        Date of Loss:          September 28, 2022
        Policy Number:         FSF16026323 002
        Policy Term:           01/03/2022 to 01/03/2023
        Claim Number:          KY22K2898390
        Writing Company:       Westchester Surplus Lines Insurance Company

Dear Mr. Kontos:

Thank you for submitting your Hurricane Ian claim for reported damage to your Building at 2360 Tamiami Trail, Port Charlotte, FL 33952. This claim was submitted for consideration under policy number FSF16026323 002. Westchester Surplus Lines Insurance Company ("Chubb") has now completed its factual investigation and offers the following comments with respect to coverage as it relates to this loss.

**The Loss**

On September 30, 2022, we received notice of damages, reportedly as a result of Hurricane Ian, to your building located 2360 Tamiami Trail, Port Charlotte, Florida. Upon receipt of the claim, we engaged independent adjusting firm, Crawford and Company, to inspect the loss on our behalf. Crawford adjuster, Dan Evans inspected the property on October 4, 2022, and he noted wind damage to the roof, fascia, signage, awnings, and fencing. He also identified some interior water damage to your Business Personal Property.

## The Policy

Westchester Surplus Lines Insurance Company ("Chubb") issued Policy Number FSF16026323 002 to Boomers Sports Grill & Bar Inc. dba KGA, Inc. with the effective dates of coverage of January 3, 2022, to January 3, 2023. Coverage is written on **CP 0010 (10/12) BUILDING AND PERSONAL PROPERTY COVERAGE FORM**, which provides $700,000 limit for Building and $100,000 limit for Business Personal Property, and subject to 5% Windstorm deductible. Coverage is subject to the term and conditions of the policy. The policy wording is cited below in order of reference.

We first refer you to the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, CP 00 10 (10/12)** which states in part:

    **A.**   *Coverage*
       *We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*

       \*\*\*

        **2.** *Property Not Covered*

          *Covered Property does not include:*

          \*\*\*

          *q.*   *The following property while outside of buildings:*

            \*\*\*

            *(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.*

        \*\*\*

        **5.** *Coverage Extensions*
        *Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises. If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:*

        \*\*\*

        *e.*  *Outdoor Property*

*You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered*

*Causes of Loss:*
*(1) Fire;*
*(2) Lightning;*
*(3) Explosion;*
*(4) Riot or Civil Commotion; or*
*(5) Aircraft.*

*The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.*

*Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.*

*     *     *

**Status of Investigation**

Our investigation confirmed wind damage to the Building, Signage, and Business Personal Property, for which payment has already been issued. However, we regret to inform you that our investigation resulted in finding that fencing, when damaged by wind, is not covered under the policy. Based off the policy language cited above, the fencing damage is denied in its entirety.

This letter only addresses those provisions that appear pertinent at this time in light of the facts currently known to us. If there is any additional information that may affect our position or analysis, please forward such information.

Westchester reserves all rights with regard to the above referenced provisions as well as all other rights, remedies and defenses under the Policy, at law and in equity. Nothing contained in this letter, and no action on our part or the part of independent adjusters or experts retained on our behalf in investigating and adjusting Insured's claim, should be construed as an admission of coverage or as a waiver of any right, remedy or defense that may be available to Weastchester.

For your protection, state law requires that we inform you of the following: Pursuant to § 817.234, Florida Statutes, any person who, with the intent to injure, defraud, or deceive any insurer or insured, prepares, presents, or causes to be presented a proof of loss or estimate of cost or repair of damaged property in support of a claim under an insurance policy knowing that the proof of loss or estimate of claim or repairs contains any false, incomplete, or misleading information concerning any fact or thing material to the claim commits a felony of the third degree, punishable as provided in § 775.082, § 775.083, or § 775.084, Florida Statutes.

We hope this letter was helpful in identifying the potential coverage issues for this claim. If you have any questions or disagree with any aspect of the foregoing, please do not hesitate to contact the undersigned immediately.

Sincerely,

*Amy Wissner*

Amy Wissner
Regional General Adjuster - Inside
O: 800-599-2163 x 1250007
E: Amy.Wissner2@Chubb.com

cc: RT Specialty, LLC - FL
    atlanticclaims@rtspecialty.com

# EXHIBIT

# B

**Murphy, Lanie**

| | |
|---|---|
| **From:** | Wissner, Amy <Amy.Wissner2@Chubb.com> |
| **Sent:** | Wednesday, October 26, 2022 2:31 PM |
| **To:** | Joseph Schaub |
| **Cc:** | Nducorrespondence; Dan Evans; NA WorkView Redirect Prod |
| **Subject:** | RE: 4049557 - Boomers Sports Grill & Bar Inc DBA KGA Inc. - Chubb claim KY22K2898390 |

Hello,

I'm inclined to agree, please obtain a budget for an Eng.  And have Dan submit the amended report, to include an undisputed payment recommendation (sans the roof), ASAP.

Thank you,

Amy Wissner
Regional General Adjuster - Inside
Florida License Number – A288715



11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022, USA
O 800-599-2163  x 1250007    F 800-664-1765
E Amy.Wissner2@chubb.com

**Chubb. Insured.**

I strive to take care of all issues and questions directly with you.  If you need to speak with my manager, Michael Wynarczuk, you can reach him at 800-599-2163  x 1250003  or via email Michael.Wynarczuk@chubb.com.

You may also contact our Claim Service Center at 1-800-252-4670  for any general inquiries.

**From:** Joseph Schaub <Joseph_Schaub@us.crawco.com>
**Sent:** Tuesday, October 25, 2022 1:07 PM
**To:** Wissner, Amy <Amy.Wissner2@Chubb.com>
**Cc:** Nducorrespondence <nducorrespondence@chubb.com>; Dan Evans <DanielM.Evans@us.crawco.com>
**Subject:** [EXTERNAL] RE: 4049557 - Boomers Sports Grill & Bar Inc DBA KGA Inc. - Chubb claim KY22K2898390

Hey Amy, I will get with Dan on the majority of the items noted and get the changes made.

However, re: the engineer – the estimate is for roof replacement, but the photographs show questionable damages, wear/tear, and pre-existing issues that don't explicitly define the need for a roof replacement.  I believe an engineer

1

would be necessary to opine on damages related to the loss, comment on pre-existing damages, and define a repair scope, if covered.

Thanks!

**Joe Schaub, CPCU, AIC, AINS, PTC 1**
Executive General Adjuster
Crawford Global Technical Services

M   480-721-8860
E   Joseph_Schaub@us.crawco.com
F   770-723-8781
W   www.crawco.com
A   2401 West Peoria Avenue, Suite 250
     Phoenix, AZ 85029

FL License W122649

**Crawford & Company**
Restoring and enhancing lives, businesses and communities



From: Wissner, Amy <Amy.Wissner2@Chubb.com>
Sent: Monday, October 24, 2022 8:46 AM
To: Joseph Schaub <Joseph_Schaub@us.crawco.com>
Cc: Nducorrespondence <nducorrespondence@chubb.com>; Dan Evans <DanielM.Evans@us.crawco.com>
Subject: RE: 4049557 - Boomers Sports Grill & Bar Inc DBA KGA Inc. - Chubb claim KY22K2898390

Good morning,

Additional information is required:

1. While the report recommends a new roof it does not discuss why – there is no description of the roof damage
2. The missing discussion on the roof condition needs to address the pre-existing damage exclusion
3. You ask if we want an engineer but make no reference as to why – are you recommending an Eng?  And if so why?
4. The report references damage to BPP but no reserve for BPP is included
5. A sign sub-limit is included in the policy but signs are not scheduled, so the sign $ will be a part of the bldg total – not separate
6. You calculated a co-insurance penalty but didn't apply it – please apply
7. Your estimated loss amounts on pg 2 do not correspond with your initial estimate amounts on pg 6 - please clarify
8. Fencing should not be in your estimate (you acknowledge this in the narrative but included it in your est)
9. Once the above is addressed – which needs to be now not at next report in 30 days – please either make a payment or advance recommendation, or confirm why one can't be made at this time

Please call me if you have questions about any of the above.


Thank you,

Amy Wissner
Regional General Adjuster - Inside
Florida License Number – A288715



11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022, USA
O 800-599-2163 x 1250007  F 800-664-1765
E Amy.Wissner2@chubb.com

Chubb. Insured.

I strive to take care of all issues and questions directly with you. If you need to speak with my manager,
Michael Wynarczuk, you can reach him at 800-599-2163 x 1250003 or via email
Michael.Wynarczuk@chubb.com.

You may also contact our Claim Service Center at 1-800-252-4670 for any general inquiries.


**From:** Joseph Schaub <Joseph_Schaub@us.crawco.com>
**Sent:** Wednesday, October 19, 2022 3:33 PM
**To:** Wissner, Amy <Amy.Wissner2@Chubb.com>
**Cc:** Nducorrespondence <nducorrespondence@chubb.com>; Dan Evans <DanielM.Evans@us.crawco.com>
**Subject:** [EXTERNAL] 4049557 - Boomers Sports Grill & Bar Inc DBA KGA Inc. - Chubb claim KY22K2898390

Amy, please see formal report 1 and enclosures. Note some of the policy issues for review/discussion. Also, advise if
you want an engineer considering we are recommending roof replacement based on what we observed.

Thanks!

**Joe Schaub, CPCU, AIC, AINS, PTC 1**
Executive General Adjuster
Crawford Global Technical Services

M  480-721-8860
E  Joseph_Schaub@us.crawco.com
F  770-723-8781
W  www.crawco.com
A  2401 West Peoria Avenue, Suite 250
   Phoenix, AZ 85029


FL License W122649

**Crawford & Company**

3

Restoring and enhancing lives, businesses and communities



Consider the environment before printing this message.

This transmission is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is confidential, proprietary, privileged or otherwise exempt from disclosure. If you are not the named addressee, you are NOT authorized to read, print, retain, copy or disseminate this communication, its attachments or any part of them. If you have received this communication in error, please notify the sender immediately and delete this communication from all computers. This communication does not form any contractual obligation on behalf of the sender, the sender's employer, or the employer's parent company, affiliates or subsidiaries.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

Consider the environment before printing this message.

This transmission is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is confidential, proprietary, privileged or otherwise exempt from disclosure. If you are not the named addressee, you are NOT authorized to read, print, retain, copy or disseminate this communication, its attachments or any part of them. If you have received this communication in error, please notify the sender immediately and delete this communication from all computers. This communication does not form any contractual obligation on behalf of the sender, the sender's employer, or the employer's parent company, affiliates or subsidiaries.

EXHIBIT

C

**Murphy, Lanie**

| | |
|---|---|
| **From:** | Ruiz, Robert <Robert.Ruiz@Chubb.com> |
| **Sent:** | Monday, September 18, 2023 2:13 PM |
| **To:** | Zaf Goss |
| **Cc:** | Property Reports |
| **Subject:** | Supplemental indemnity payment // Boomers Sports Grill & Bar, Inc. // Claim No. KY22K2898390 | 10113 - WESTCHESTER SURPLUS LINES INSURANCE COMPANY |
| **Attachments:** | Estimate of Covered Damages - updated.pdf |

Good afternoon Mr. Goss,

Attempted to reach you and left a brief message at your office (407) 961-6410.

We have thoroughly reviewed your demand and issued a supplemental indemnity check in the amount of **$92,866.22** and it is being forwarded to your office.

| | |
|---|---|
| $204,363.83 | Building Covered Damages |
| $10,000.00 | Signs at Policy Sublimit |
| ($27,632.08) | Less Recoverable Depreciation |
| ($3,023.05) | Less Non-Recoverable Depreciation |
| ($35,000.00) | Less Applicable Deductible |
| **$148,708.70** | Net Indemnity |
| ($55,842.48) | Less prior Payment |
| **$92,866.22** | Supplemental Indemnity Payment |

| | |
|---|---|
| $26,453.43 | Business Personal Property |
| ($5,000.00) | Less Deductible |
| $21,453.43 | Net Indemnity |
| ($21,453.43) | Less prior Payment |
| $0.00 | Current Net Business Personal Property |

Our investigation of this matter, action on the part of our independent adjusters and/or experts retained on our behalf in investigating and adjusting your claim, should be construed as an admission of coverage or as a waiver of any right, remedy or defense that may be available to Chubb under the policy of insurance. No estoppels are intended or implied.

If there is any additional information that may affect our position or analysis, please forward such information. Yours truly is and will remain at your service to address any questions or concerns.

Thank you sir.

**Robert S. Ruiz**
Property Claim Analyst
FL Lic A228216
D (404) 905-6333
O (800) 599-2163 x1250008
F (800) 664-1765
E Robert.Ruiz@Chubb.com

1

*** When forwarding documents, please include the claim number in the subject line and carbon copy
PropertyReports@Chubb.com



**Westchester®**
A Chubb Company
11575 Great Oaks Way
Suite 200
Alpharetta, GA 30022, USA

Chubb. Insured.™
I strive to take care of all issues and questions directly with you.  If you need to speak with my manager, Ms. Rebecca K. Viola, you
can reach her at (770) 891-5839 or via Email Rebecca.Viola@chubb.com

# Proud To Claim Chubb

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public,
proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of
this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be
deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this
email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving,
printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"),
we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects.
All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of
this email is expressly disclaimed.

**From:** Ruiz, Robert
**Sent:** Wednesday, August 30, 2023 6:27 PM
**To:** Zaf Goss <zg@hmglegal.com>
**Cc:** Property Reports <propertyreports@chubb.com>; Pasternack, Chad A. <CPasternack@cozen.com>
**Subject:** RE: Boomers Sports Grill & Bar, Inc.; Westchester Claim No. KY22K2898390 | 10113 - WESTCHESTER SURPLUS
LINES INSURANCE COMPANY

Good afternoon Mr. Goss,

We are finishing up our review of your claim submission and will be issuing a supplemental payment shortly.

Thank you sir.

**Robert S. Ruiz**
Property Claim Analyst
FL Lic A228216
D (404) 905-6333
O (800) 599-2163 x1250008
F (800) 664-1765
E Robert.Ruiz@Chubb.com

*** When forwarding documents, please include the claim number in the subject line and carbon copy
PropertyReports@Chubb.com

**Westchester**®
A Chubb Company
11575 Great Oaks Way
Suite 200
Alpharetta, GA 30022, USA

Chubb. Insured.℠
I strive to take care of all issues and questions directly with you.  If you need to speak with my manager, Ms. Rebecca K. Viola, you
can reach her at (770) 891-5839 or via Email Rebecca.Viola@chubb.com

# Proud To Claim Chubb

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public,
proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of
this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be
deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this
email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving,
printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"),
we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects.
All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of
this email is expressly disclaimed.

**From:** Zaf Goss <zg@hmglegal.com> **On Behalf Of** Zaf Goss <zg@hmglegal.com>
**Sent:** Wednesday, August 30, 2023 5:57 PM
**To:** Pasternack, Chad A. <CPasternack@cozen.com>; Presuit <presuit@hmglegal.com>
**Subject:** Re: Boomers Sports Grill & Bar, Inc.; Property Insurance Notice of Intent to Initiate Litigation No. 119953;
Westchester Claim No. KY22K2898390

**\*\*EXTERNAL SENDER\*\***

Good evening,

Please see attached.


Zaf Goss



3

**Habermehl Millard Goss LLP**

Quadra Building, Suite 300

385 W. Fairbanks Ave.

Winter Park, FL 32789

(407) 961-6410

www.hmglegal.com

CONFIDENTIALITY NOTICE: THIS MESSAGE AND ANY ATTACHMENTS ARE FROM HABERMEHL MILLARD GOSS LLP, AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL. IT IS INTENDED FOR RECEIPT AND REVIEW ONLY BY THE INTENDED PERSON OR ENTITY TO WHICH IT IS ADDRESSED. ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF THIS INFORMATION BY PERSONS OR ENTITIES OTHER THAN THE RECIPIENT(S) IS UNAUTHORIZED AND PROHIBITED. ANY TRANSMISSION OF CONFIDENTIAL AND/OR PRIVILEGED MATERIAL TO PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT(S) SHALL NOT BE CONSTRUED AS A WAIVER OF AN PRIVILEGE OR CONFIDENCE. IF YOU RECEIVE THIS TRANSMISSION IN ERROR, CONTACT THE SENDER BY RETURN E-MAIL AND DELETE THE EMAIL.

---

**From:** Pasternack, Chad A. <CPasternack@cozen.com>
**Sent:** Friday, June 30, 2023 8:37 AM
**To:** Presuit <presuit@hmglegal.com>
**Subject:** Boomers Sports Grill & Bar, Inc.; Property Insurance Notice of Intent to Initiate Litigation No. 119953; Westchester Claim No. KY22K2898390

Dear Mr. Millard,

Please see the attached response on behalf of Westchester Surplus Lines Insurance Company to Property Insurance Notice of Intent to Initiate Litigation No. 119953.

Thank you,

Chad



**Chad A. Pasternack**
Member | Cozen O'Connor
Co-Chair, Insurance Bad Faith Group
1801 N. Military Trail, Suite 200 | Boca Raton, FL 33431
P: 561-515-5269 F: 561-515-5230
Email | Bio | Map | cozen.com

***Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction***

*of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

## Crawford & Company

5335 Triangle Parkway
Peachtree Corners, GA. 30092

| | | | |
|---|---|---|---|
| Insured: | Boomers Sports Bar | Cellular: | (941) 380-2305 |
| Property: | 2360 Tamiami Trail | | |
| | Port Charlottes, FL 33592 | | |
| | | | |
| Claim Rep.: | Dan Evans | Cellular: | (630) 465-6649 |
| | | E-mail: | danielm.evans@us.crawco.com |
| | | | |
| Estimator: | Dan Evans | Cellular: | (630) 465-6649 |
| | | E-mail: | danielm.evans@us.crawco.com |
| | | | |
| Reference: | | | |
| Company: | GTS | | |

**Claim Number:** KY22K2898390          **Policy Number:** FSF16026323          **Type of Loss:** Wind Damage

| | | | |
|---|---|---|---|
| Date Contacted: | 10/3/2022 11:28 AM | | |
| Date of Loss: | 9/28/2022 11:28 AM | Date Received: | 10/3/2022 11:28 AM |
| Date Inspected: | 10/4/2022 11:28 AM | Date Entered: | 10/17/2022 11:19 AM |
| | | | |
| Price List: | FLTA8X_OCT22 | | |
| | Restoration/Service/Remodel | | |
| Estimate: | BOOMERS_SPORTS_BAR | | |

**Crawford & Company**

5335 Triangle Parkway
Peachtree Corners, GA. 30092

### BOOMERS_SPORTS_BAR
#### Roof



**Roof2**

11441.36  Surface Area                  114.41  Number of Squares
479.12  Total Perimeter Length

| QUANTITY | UNIT | TAX | O&P | RCV | AGE/LIFE | COND. | DEP % | | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|---|
| **Roof** | | | | | | | | | | |
| 56. Tear off, haul and dispose membrane roofing - full adhered | | | | | | | | | | |
| 114.41 SQ | 104.84 | 0.00 | 2,398.94 | 14,393.68 | 0/21 yrs | Avg. | NA | | (0.00) | 14,393.68 |
| 57. Replace Insulation - ISO board, 2" | | | | | | | | | | |
| 114.41 SQ | 324.37 | 964.91 | 7,615.22 | 45,691.30 | 10/150 yrs | Avg. | 20% | [%] | (7,422.23) | 38,269.07 |
| 58. Replace Curb flashing - PVC/TPO | | | | | | | | | | |
| 120.00 LF | 19.55 | 82.80 | 485.76 | 2,914.56 | 10/21 yrs | Avg. | 20% | [%] | (469.20) | 2,445.36 |
| 59. Replace Flash parapet wall only | | | | | | | | | | |
| 129.50 LF | 10.82 | 15.25 | 283.30 | 1,699.74 | 10/20 yrs | Avg. | 20% | [%] | (280.24) | 1,419.50 |
| 60. Replace Hip & ridge nailer board for tile roofing - wood | | | | | | | | | | |
| 479.12 LF | 3.97 | 67.20 | 393.86 | 2,363.17 | 10/75 yrs | Avg. | 20% | [%] | (380.42) | 1,982.75 |
| 61. Replace Drip edge - PVC/TPO clad metal with cleat | | | | | | | | | | |
| 479.12 LF | 13.81 | 399.95 | 1,403.34 | 8,419.94 | 10/35 yrs | Avg. | 20% | [%] | (1,323.33) | 7,096.61 |
| 62. Replace Membrane roofing - cant strips - perlite | | | | | | | | | | |
| 479.12 LF | 2.21 | 16.17 | 215.02 | 1,290.05 | 10/35 yrs | Avg. | 20% | [%] | (211.77) | 1,078.28 |
| 63. Replace Modified bitumen roof - hot mopped | | | | | | | | | | |
| 114.41 SQ | 464.52 | 1,150.68 | 10,859.28 | 65,155.69 | 10/20 yrs | Avg. | 20% | [%] | (10,629.15) | 54,526.54 |
| *Includes identified damages on North and South Slopes. | | | | | | | | | | |
| 64. Replace Elastomeric roof coating (rubberized) for mobile home | | | | | | | | | | |
| 11,441. SF 36 | 1.98 | 695.06 | 4,669.80 | 28,018.75 | 10/10 yrs | Avg. | 20% | [%] | (4,530.78) | 23,487.97 |
| 65. Replace Gravel stop | | | | | | | | | | |
| 479.12 LF | 2.61 | 31.98 | 256.50 | 1,538.98 | 10/35 yrs | Avg. | 20% | [%] | (250.10) | 1,288.88 |
| 84. R&R Gutter / downspout - box - aluminum - 7" to 8" | | | | | | | | | | |
| 250.00 LF | 21.94 | 337.69 | 1,164.54 | 6,987.23 | 0/25 yrs | Avg. | 25% | [%] | (1,330.63) | 5,656.60 |
| 100. R&R Fascia - 1" x 6" - #1 pine | | | | | | | | | | |
| 40.00 LF | 6.53 | 6.75 | 53.60 | 321.55 | 0/75 yrs | Avg. | 25% | [%] | (61.00) | 260.55 |
| 102. Replace Wrap custom fascia with aluminum (PER LF) | | | | | | | | | | |
| 40.00 LF | 13.14 | 9.99 | 107.12 | 642.71 | 0/50 yrs | Avg. | 25% | [%] | (131.40) | 511.31 |
| 99. Replace Two ladders with jacks and plank (per day) | | | | | | | | | | |
| 5.00 DA | 116.63 | 0.00 | 116.64 | 699.79 | 0/NA | Avg. | 0% | | (0.00) | 699.79 |
| 105. Replace Scaffolding Setup & Take down - per hour | | | | | | | | | | |
| 10.00 HR | 48.99 | 0.00 | 97.98 | 587.88 | 0/NA | Avg. | 0% | | (0.00) | 587.88 |
| *Labor to manipulate scaffolding for awning repair, fascia repair and painting of fascia around the building. | | | | | | | | | | |

**Crawford & Company**

5335 Triangle Parkway
Peachtree Corners, GA. 30092

### CONTINUED - Roof2

| | QUANTITY | UNIT | TAX | O&P | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|---|
| 86. Replace Awning - Window/door - Canvas (fixed) | | | | | | | | | | |
| | 29.00 LF | 165.50 | 237.08 | 1,007.32 | 6,043.90 | 5/8 yrs | Avg. | 62.5% | <2,999.69> | 3,044.21 |
| 97. Replace Awning side panels - Alum./steel (PER SET) | | | | | | | | | | |
| | 4.00 EA | 58.40 | 10.59 | 48.84 | 293.03 | 4/40 yrs | Avg. | 10% | <23.36> | 269.67 |
| 98. Awning & Patio Cover Installer - per hour | | | | | | | | | | |
| | 8.00 HR | 67.40 | 0.00 | 107.84 | 647.04 | 0/NA | Avg. | 0% | (0.00) | 647.04 |
| *Labor to repair awning framing. 1 man. 8 hrs for one day | | | | | | | | | | |
| **HVAC** | | | | | | | | | | |
| 88. Remove Air conditioning unit, 5 ton - Commercial grade | | | | | | | | | | |
| | 1.00 EA | 325.46 | 0.00 | 65.10 | 390.56 | 0/15 yrs | Avg. | NA | (0.00) | 390.56 |
| 90. Install Air conditioning unit, 5 ton - Commercial grade | | | | | | | | | | |
| | 1.00 EA | 3,424.79 | 0.00 | 684.96 | 4,109.75 | 0/15 yrs | Avg. | 0% | (0.00) | 4,109.75 |
| *Air conditioning unit was shifted from its curb. It will have to be reset. | | | | | | | | | | |
| 91. Replace Water supply line - PVC with fitting and hanger, 1/2" | | | | | | | | | | |
| | 90.00 LF | 17.33 | 4.39 | 312.82 | 1,876.91 | 0/65 yrs | Avg. | 25% [%] | (389.93) | 1,486.98 |
| Condensate lines on roof were blown off. | | | | | | | | | | |
| 93. Replace Power attic vent cover only - metal | | | | | | | | | | |
| | 1.00 EA | 107.12 | 2.28 | 21.88 | 131.28 | 0/7 yrs | Avg. | 10% [%] | (10.71) | 120.57 |
| 94. Replace HVAC Technician - per hour | | | | | | | | | | |
| | 12.00 HR | 129.50 | 0.00 | 310.80 | 1,864.80 | 0/NA | Avg. | 0% | (0.00) | 1,864.80 |
| *Labor allowance is to make miscellaneous repairs to 5 units that have missing or broken covers that do not affect the performance of the unit. | | | | | | | | | | |
| 95. Replace HEAT , VENT & AIR CONDITIONING-materials for 5 unit repairs* | | | | | | | | | | |
| | 1.00 EA | 625.00 | 0.00 | 125.00 | 750.00 | 0/NA | Avg. | 0% | (0.00) | 750.00 |
| *Material allowance includes tax | | | | | | | | | | |
| 96. Replace Test & Balance - HVAC system (under 20,000 sf) | | | | | | | | | | |
| | 8,000.00 SF | 0.42 | 0.00 | 672.00 | 4,032.00 | 0/NA | Avg. | 0% | (0.00) | 4,032.00 |
| **Totals: Roof2** | | **4,032.77** | **33,477.46** | **200,864.29** | | | | | **30,443.94** | **170,420.35** |
| **Total: Roof** | | **4,032.77** | **33,477.46** | **200,864.29** | | | | | **30,443.94** | **170,420.35** |

### Interior

| | QUANTITY | UNIT | TAX | O&P | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|---|
| 146. R&R Batt insulation - 10" - R30 - unfaced batt | | | | | | | | | | |
| | 300.00 SF | 2.09 | 26.10 | 130.62 | 783.72 | 0/150 yrs | Avg. | 0% | (0.00) | 783.72 |
| 120. R&R Suspended ceiling tile - High grade - 2' x 4' | | | | | | | | | | |
| | 300.00 SF | 3.58 | 47.70 | 224.34 | 1,346.04 | 0/150 yrs | Avg. | 20% [%] | (199.20) | 1,146.84 |

**Crawford & Company**

5335 Triangle Parkway
Peachtree Corners, GA. 30092

### CONTINUED - Interior

| QUANTITY | UNIT | TAX | O&P | RCV | AGE/LIFE | COND. | DEP % | | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|---|
| Repairs to various ceiling tiles from water intrusion in the bar and kitchen areas | | | | | | | | | | |
| 122.  Suspended ceiling grid - Reset/realign | | | | | | | | | | |
| 300.00 SF | 2.23 | 0.23 | 133.84 | 803.07 | 0/NA | Avg. | 0% | | (0.00) | 803.07 |
| 123.  Replace Light bulb - LED candle - over 200 to 350 lm - mat. only | | | | | | | | | | |
| 2.00 EA | 10.99 | 1.65 | 4.74 | 28.37 | 0/8 yrs | Avg. | 40% | [%] | (8.79) | 19.58 |
| 124.  Replace Light bulb - LED candle - up to 200 lm - material only | | | | | | | | | | |
| 1.00 EA | 7.99 | 0.60 | 1.72 | 10.31 | 0/8 yrs | Avg. | 40% | [%] | (3.20) | 7.11 |
| **Totals:  Interior** | | **76.28** | **495.26** | **2,971.51** | | | | | **211.19** | **2,760.32** |

### Sign

| QUANTITY | UNIT | TAX | O&P | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|
| 137.  R&R Commercial sign - cabinet only - single face | | | | | | | | | |
| 288.00 SF | 58.17 | 3,449.96 | 20,699.72 | 0/10 yrs | Avg. | 0% | | (0.00) | 20,699.72 |
| 139.  Rewire\wire - avg. residence - boxes & wiring | | | | | | | | | |
| 350.00 SF | 4.83 | 16.54 | 341.40 | 2,048.44 | 0/100 yrs | Avg. | 0% | (0.00) | 2,048.44 |
| 140.  Replace Fluorescent - two tube - 4' - strip light | | | | | | | | | |
| 4.00 EA | 113.85 | 13.94 | 93.86 | 563.20 | 0/20 yrs | Avg. | 0% | (0.00) | 563.20 |
| 141.  Replace Light bulb - Fluorescent tube - 4' soft white - mat. only | | | | | | | | | |
| 8.00 EA | 6.81 | 4.09 | 11.72 | 70.29 | 0/5 yrs | Avg. | 0% | (0.00) | 70.29 |
| **Totals:  Sign** | | **531.37** | **3,896.94** | **23,381.65** | | | | **0.00** | **23,381.65** |

### Miscellaneous

| QUANTITY | UNIT | TAX | O&P | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|
| 134.  Material Only Tarp - all-purpose poly - per sq ft (labor and material) | | | | | | | | | |
| 90.00 SF | 0.30 | 2.03 | 5.80 | 34.83 | 0/NA | Avg. | 0% | (0.00) | 34.83 |
| 136.  Dumpster load - Approx. 12 yards, 1-3 tons of debris | | | | | | | | | |
| 1.00 EA | 411.00 | 0.00 | 82.20 | 493.20 | 0/NA | Avg. | NA | (0.00) | 493.20 |
| **Totals:  Miscellaneous** | | **2.03** | **88.00** | **528.03** | | | | **0.00** | **528.03** |
| **Line Item Totals:  BOOMERS_ SPORTS_BAR** | | **4,642.45** | **37,957.66** | **227,745.48** | | | | **30,655.13** | **197,090.35** |

## Crawford & Company

5335 Triangle Parkway
Peachtree Corners, GA. 30092

[%] - Indicates that depreciate by percent was used for this item
[M] - Indicates that the depreciation percentage was limited by the maximum allowable depreciation for this item

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 0.00 | SF Walls | 0.00 | SF Ceiling | 0.00 | SF Walls and Ceiling |
| 0.00 | SF Floor | 0.00 | SY Flooring | 0.00 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 0.00 | LF Ceil. Perimeter |
| 0.00 | Floor Area | 0.00 | Total Area | 0.00 | Interior Wall Area |
| 934.03 | Exterior Wall Area | 0.00 | Exterior Perimeter of Walls | | |
| 11,441.36 | Surface Area | 114.41 | Number of Squares | 479.12 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

| Coverage | Item Total | % | ACV Total | % |
|---|---|---|---|---|
| Dwelling | 204,363.83 | 89.73% | 173,708.70 | 88.14% |
| Sign | 23,381.65 | 10.27% | 23,381.65 | 11.86% |
| Outdoor Property Fence | 0.00 | 0.00% | 0.00 | 0.00% |
| Property Protected - Building | 0.00 | 0.00% | 0.00 | 0.00% |
| Property Removed - Building | 0.00 | 0.00% | 0.00 | 0.00% |
| Detached Garage | 0.00 | 0.00% | 0.00 | 0.00% |
| Property Removed - Personal Property | 0.00 | 0.00% | 0.00 | 0.00% |
| ICC | 0.00 | 0.00% | 0.00 | 0.00% |
| Betterments and Improvements | 0.00 | 0.00% | 0.00 | 0.00% |
| Debris Removal - Building | 0.00 | 0.00% | 0.00 | 0.00% |
| Pollution Damage - Building | 0.00 | 0.00% | 0.00 | 0.00% |
| Condominium Loss Assessment | 0.00 | 0.00% | 0.00 | 0.00% |
| Property Protected - Personal Property | 0.00 | 0.00% | 0.00 | 0.00% |
| Debris Removal - Personal Property | 0.00 | 0.00% | 0.00 | 0.00% |
| Pollution Damage - Personal Property | 0.00 | 0.00% | 0.00 | 0.00% |
| Total | 227,745.48 | 100.00% | 197,090.35 | 100.00% |

**Crawford & Company**

5335 Triangle Parkway
Peachtree Corners, GA. 30092

## Summary for Dwelling

| | |
|---|---:|
| Line Item Total | 166,192.03 |
| Material Sales Tax | 4,111.08 |
| Subtotal | 170,303.11 |
| Overhead | 17,030.36 |
| Profit | 17,030.36 |
| **Replacement Cost Value** | **$204,363.83** |
| Less Depreciation | (30,655.13) |
| **Actual Cash Value** | **$173,708.70** |
| Less Deductible | (35,000.00) |
| **Net Claim** | **$138,708.70** |
| Total Depreciation | 30,655.13 |
| Less Non-Recoverable Depreciation | <3,023.05> |
| Total Recoverable Depreciation | 27,632.08 |
| **Net Claim if Depreciation is Recovered** | **$166,340.78** |

Dan Evans

**Crawford & Company**

5335 Triangle Parkway
Peachtree Corners, GA. 30092

### Summary for Sign

| | |
|---|---:|
| Line Item Total | 18,953.34 |
| Material Sales Tax | 531.37 |
| Subtotal | 19,484.71 |
| Overhead | 1,948.47 |
| Profit | 1,948.47 |
| **Replacement Cost Value** | **$23,381.65** |
| Less Amount Over Limit(s) | (13,381.65) |
| **Net Claim** | **$10,000.00** |

Dan Evans

**Crawford & Company**

5335 Triangle Parkway
Peachtree Corners, GA. 30092

### Recap by Category with Depreciation

| O&P Items | | | RCV | Deprec. | ACV |
|---|---|---|---|---|---|
| **ACOUSTICAL TREATMENTS** | | | **1,665.00** | **199.20** | **1,465.80** |
| Coverage: Dwelling | @ | 100.00% = | 1,665.00 | | |
| **AWNINGS & PATIO COVERS** | | | **5,572.30** | **3,023.05** | **2,549.25** |
| Coverage: Dwelling | @ | 100.00% = | 5,572.30 | | |
| **GENERAL DEMOLITION** | | | **13,688.50** | | **13,688.50** |
| Coverage: Dwelling | @ | 95.90% = | 13,126.90 | | |
| Coverage: Sign | @ | 4.10% = | 561.60 | | |
| **ELECTRICAL** | | | **1,690.50** | | **1,690.50** |
| Coverage: Sign | @ | 100.00% = | 1,690.50 | | |
| **MISC. EQUIPMENT - COMMERCIAL** | | | **16,191.36** | | **16,191.36** |
| Coverage: Sign | @ | 100.00% = | 16,191.36 | | |
| **HEAT,  VENT & AIR CONDITIONING** | | | **9,070.91** | **10.71** | **9,060.20** |
| Coverage: Dwelling | @ | 100.00% = | 9,070.91 | | |
| **INSULATION** | | | **489.00** | | **489.00** |
| Coverage: Dwelling | @ | 100.00% = | 489.00 | | |
| **LIGHT FIXTURES** | | | **539.85** | **11.99** | **527.86** |
| Coverage: Dwelling | @ | 5.55% = | 29.97 | | |
| Coverage: Sign | @ | 94.45% = | 509.88 | | |
| **PLUMBING** | | | **1,559.70** | **389.93** | **1,169.77** |
| Coverage: Dwelling | @ | 100.00% = | 1,559.70 | | |
| **ROOFING** | | | **127,486.10** | **25,497.22** | **101,988.88** |
| Coverage: Dwelling | @ | 100.00% = | 127,486.10 | | |
| **SCAFFOLDING** | | | **1,073.05** | | **1,073.05** |
| Coverage: Dwelling | @ | 100.00% = | 1,073.05 | | |
| **SOFFIT, FASCIA, & GUTTER** | | | **6,092.10** | **1,523.03** | **4,569.07** |
| Coverage: Dwelling | @ | 100.00% = | 6,092.10 | | |
| **TEMPORARY REPAIRS** | | | **27.00** | | **27.00** |
| Coverage: Dwelling | @ | 100.00% = | 27.00 | | |
| **O&P Items Subtotal** | | | **185,145.37** | **30,655.13** | **154,490.24** |
| **Material Sales Tax** | | | **4,642.45** | | **4,642.45** |
| Coverage: Dwelling | @ | 88.55% = | 4,111.08 | | |
| Coverage: Sign | @ | 11.45% = | 531.37 | | |
| **Overhead** | | | **18,978.83** | | **18,978.83** |
| Coverage: Dwelling | @ | 89.73% = | 17,030.36 | | |
| Coverage: Sign | @ | 10.27% = | 1,948.47 | | |
| **Profit** | | | **18,978.83** | | **18,978.83** |
| Coverage: Dwelling | @ | 89.73% = | 17,030.36 | | |
| Coverage: Sign | @ | 10.27% = | 1,948.47 | | |
| **Total** | | | **227,745.48** | **30,655.13** | **197,090.35** |

BOOMERS_SPORTS_BAR





Roof2

# EXHIBIT

# D



October 16, 2023

**Chad A. Pasternack**
Direct Phone    561-515-5269
Direct Fax      561-515-5231
cpasternack@cozen.com

**VIA E-MAIL (ZG@HMGLEGAL.COM)**

Zaf Goss
Habermehl Millard Goss LLP
385 W. Fairbanks Ave., Suite 300
Winter Park, FL 32789

| Re: | Insured: | **Boomers Sports Grill & Bar Inc.** |
|---|---|---|
| | Date of Loss: | **September 28, 2022** |
| | Loss Location: | **2360 Tamiami Trail, Port Charlotte, FL 33952** |
| | Type of Loss: | **Hurricane Ian** |
| | Policy Number: | **FSF16026323 002** |
| | Claim Number: | **KY22K2898390** |
| | Insurer: | **Westchester Surplus Lines Insurance Company** |

Dear Mr. Goss:

Please accept this letter on behalf of Westchester Surplus Lines Insurance Company ("Westchester") in connection with the demand for appraisal by Boomers Sports Grill & Bar, Inc. ("Boomers") in connection with the above-referenced insurance claim. Boomers has not yet selected an appraiser. As discussed in more detail below, Westchester designated Matt Flax as its appraiser, and reserves all rights under the policy.

### I.    Background

On September 30, 2022, we received notice of damages, reportedly as a result of Hurricane Ian, to your building located 2360 Tamiami Trail, Port Charlotte, Florida. Upon receipt of the claim, we engaged independent adjusting firm, Crawford and Company, to inspect the loss on our behalf. Crawford adjuster, Dan Evans inspected the property on October 4, 2022, and he noted wind damage to the roof, fascia, signage, awnings, and fencing. He also identified some interior water damage to your Business Personal Property. Westchester also engaged professional engineer Eric Kizak, P.E., with Envista Forensics, to assist with determining the causes and scope of damage to the property.

Mr. Kizak concluded:

    *1. Winds from Hurricane Ian damaged the following items on the building:*

        *· The four awnings located at the west ends of the north and south elevations.*

        *· The roof covering was partially delaminated and gouged by windborne debris.*

        *· Appurtenances and covers on the rooftop mechanical units.*

1801 North Military Trail, Suite 200, Boca Raton, FL 33431
561.750.3850    800.523.1900    561.750.4069 Fax    cozen.com

Zaf Goss
October 16, 2023
Page 2

---

2. *Rainwater infiltrating through wind-created breaches in the roof covering damaged the ceilings tile within the restaurant of the building.*

3. *Rainwater infiltrating through preexisting [deficiencies] damaged the wall and ceiling finishes in the office located in the southeast corner of the building.*

He recommended the following scope of work: (1) Remove and replace the damaged portion of the roof covering on the north portion of the building from the north roof line to the firewall separating the north and south roof sections; (2) Reconstruct the north tiki bar awning; (3) Installed new fascia on the awning above the restaurant entrance; (4) Install new side panels on the awning above the bar/lounge entrance; (5) Install new facia on the south tiki bar awning; and (6) Inspect the connections of the three remaining awnings to the building. Replace missing and tighten loosened anchors. Mr. Evans then prepared an estimate consistent with Mr. Kizak's findings.

As explained in more detail in emails dated November 19, 2022 and February 1, 2023, Westchester extended coverage and issued a series of payments. In the February 1, 2023 email, Westchester explained: "The estimated repair cost of the damages is $103,654.72. Payment is being sent in the amount of $17,438.43 after a reduction for the applicable deductible ($35,000.00) and depreciation ($14,271.09), less the 8% coinsurance penalty ($8,541.15), and less the prior amount paid ($38,404.05). This includes the policy sub-limit of $10,000, towards the sign repair ($23,381.65)."

On June 19, 2023, Boomers concurrently gave Westchester notice that it intends to initiate litigation and demanded appraisal. In connection with its demand for appraisal, Boomers submitted a report and estimate from CBSS Inc. The estimate reflects a Net Claim for "Dwelling" of $512,291.14, a Net Claim for "Other Structures" of $22,485.38, and a Net Claim for "Contents" of $34,947.31. The estimate was not previously provided to Westchester for review. Boomers also advised that it "disputes the valuation" of the property applied by Westchester for determining whether the co-insurance requirement was satisfied, but Boomers did not provide any competing valuation.

After receiving the CBSS Inc. estimate, Westchester, sent Boomers a reservation of rights letter. Westchester requested additional documentation regarding the damage to Boomers' property. With respect to the demand for appraisal by Boomers, Westchester advised:

> Appraisal is appropriate if Boomers and Westchester disagree on the value of the property or the amount of loss. Boomers filed a Property Insurance Notice of Intent to Initiate Litigation on June 19, 2023 and attached to it a report and estimate by CBSS Inc. Westchester has not yet had an opportunity to evaluate the scope of repairs and amounts claimed in this estimate. Accordingly, there is not yet a genuine dispute over the amount of loss or value of the property such that appraisal would be appropriate. Westchester will follow up with you shortly once it has completed its evaluation of the supplemental submission from Boomers. If after that time there remains a dispute over the amount of loss, then appraisal may become appropriate.

On August 22, 2023, Boomers again requested appraisal, but did not select an appraiser.

On September 18, 2023, Robert Ruiz, on behalf of Westchester, emailed Mr. Goss advising that Westchester had issued aa supplemental payment of $92,866.22. On September 21, 2023, Mr.

Zaf Goss
October 16, 2023
Page 3

Ruiz, after attempting to reach Mr. Goss by telephone, emailed Mr. Goss and requested he call or reply by email "to discuss resolution options." Mr. Goss did not call or reply by email.

On October 10, 2023, Boomers served Westchester with a lawsuit seeking to compel Westchester to select an appraiser.

## II.    **Appraisal**

Westchester issued to Boomers a commercial property insurance policy bearing policy number FSF16026323 002, with policy period from January 3, 2022 to January 3, 2023 ("Policy"). The Policy contains the following appraisal provision:

### E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

The Policy requires appraisers to be "competent and impartial," meaning, amongst other things, that appraisers cannot have a financial interest in the outcome of the claim, such as a contingent fee agreement or any type of outcome-based compensation.

Westchester names as its appraiser:

Matthew Flax
Flax & Associates
3835 NW Boca Raton Blvd., Suite 200
Boca Raton, FL 33431
Office: 561-299-6663
Direct: 305-793-5299
mflax@flaxandassociates.com

Please promptly advise as to whom Boomers selects as its appraiser, and explain the basis of the appraiser's compensation.

Zaf Goss
October 16, 2023
Page 4

With respect to the appraisal, the Policy states that the appraisal panel will determine the "amount of loss." The appraisal panel cannot make coverage determinations. All policy provisions, terms, conditions, exclusions, and limitations will apply, and Westchester reserves the right to deny the claim in whole or in part following appraisal.

III.    **Conclusion**

Westchester reserves all rights with regard to the above-referenced policy provisions, as well as all other rights, remedies and defenses under the Policy, at law, and in equity. These reservations include, but are not limited to, the right to amend this letter to address additional coverage issues as they may arise, based upon the Policy and/or any additional facts that may come to Westchester's attention. Nothing contained in this letter, and no action on Westchester's part or the part of independent adjusters, appraisers, or experts retained on its behalf should be construed as an admission of coverage or as a waiver of any right, remedy or defense that may be available to Westchester.

The foregoing statement of Westchester's position with respect to the above-referenced claim is based on information that has been provided to date. Please promptly provide all additional documentation you believe will assist Westchester in its investigation.

We hope this letter was helpful in identifying the potential coverage issues for this claim. If you have any questions or disagree with any aspect of the foregoing, please do not hesitate to contact the undersigned immediately.

Sincerely,

COZEN O'CONNOR

By:    Chad A. Pasternack

CAP

# EXHIBIT

# E

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:23-cv-01004-JES-NPM

BOOMER'S NEIGHBORHOOD GRILL &
BAR, INC. d/b/a KGA, INC.,

        Plaintiff,

v.

WESTCHESTER SURPLUS
LINES INSURANCE COMPANY,

        Defendant.

_____/

### DEFENDANT WESTCHESTER SURPLUS LINES INSURANCE COMPANY'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant   WESTCHESTER   SURPLUS   LINES   INSURANCE   COMPANY

("Westchester" or "Defendant"), by and through its counsel and pursuant to Fla. R. Civ. P. 1.340,

hereby answers Plaintiff's First Set of Interrogatories as follows:

1.   Please provide the following information regarding the initial reporting of the Claim to Defendant:

    a.   What date the Loss was initially reported to Defendant?

        **ANSWER**: The loss was reported on September 30, 2022.

    b.   Who initially reported the Loss to Defendant?

        **ANSWER**: The loss was reported by the insured's representative Andrew Konton and/or an individual called Deborah (last name unknown).

    c.   If a description of the Loss was reported to Defendant at the time the Loss was initially reported, how was the Loss described? This includes, but not is not limited to, information regarding the cause, extent, and date of loss provided to Defendant at the time the Loss was initially reported.

Docusign Envelope ID: 838E67EE-4849-40FA-BAFE-EDF353EE722D

**ANSWER**: See documents produced. Notwithstanding, the First Notice of Loss document which has been produced to the Plaintiff states that the loss was described as a "Hurricane Ian, without power, some of the roof is damaged. Water inside from the roof. Sign for the business is completely damaged. Refrigerator has no power."

2.   Identify by listed the names, addresses, phone numbers, and email addresses of all persons who, on Defendant's behalf, have in any way participated in the evaluation, adjusting or handling of the Claim. Please specify the nature of the participation for every such person.

**ANSWER**:

Amy Wissner
Regional General Adjuster
Westchester Surplus Lines Insurance Company
c/o Cozen O'Connor

Joe Schaub, CPCU, AIC, AINS, PTC 1
Executive General Adjuster
Crawford Global Technical Services
2401 West Peoria Avenue, Suite 250
Phoenix, AZ 85029

Victoria Robins
Claim Supervisor
Westchester Surplus Lines Insurance Company
c/o Cozen O'Connor

Dan Evans
National General Adjuster
Crawford Global Technical Services
2401 West Peoria Avenue, Suite 250
Phoenix, AZ 85029

Scott Clark
AVP - Claims Supervisor, North American Property Claims
1 Beaver Valley Road,
Wilmington, DE 19803

Eric Kizak, P.E.
Envista Forensics
5565 Glenridge Connector, Suite 900
Atlanta, Georgia 30342

Appraisers, Matthew Flax and Aaron Penn, as well as the umpire Art Newman

LEGAL\76924614\1

Any experts to be disclosed by Westchester in this case.

Westchester reserves the right to amend and/or supplement this response as discovery is ongoing.

3.    Identify by listing the names, addresses, phone numbers, and email addresses of all persons who, on Plaintiffs' behalf, have in any way participated in the investigation, evaluation, adjusting or handling of the Claim. Please specify the nature of the participation for every such person.

**ANSWER**: See the response to interrogatory number 2.

4.    Please provide the following information regarding external communication, not Defendant's internal communications, made or received with respect to the Claim:

a.    Identify the date(s) of every external communication made by Defendant regard the Claim by listing the date, the person making the communication, and the form of communication (email, phone, letter, etc.) and to whom the communication was directed.

**ANSWER**: See the documents that were previously produced to the Plaintiff on January 29, 2024 and on March 12, 2025, as the answer to this interrogatory can be ascertained by reviewing said documents.

b.    Identify the date(s) of every external communication received by Defendant regarding the Claim by listing the date, the person making the communication, the form of communication (email, phone, letter, etc.) and to whom the communication was directed.

**ANSWER**: See the documents that were previously produced to the Plaintiff on January 29, 2024 and on March 12, 2025, as the answer to this interrogatory can be ascertained by reviewing said documents.

5.    Identify by listing the names, addresses, phone numbers, and email addresses of all persons who, on Plaintiffs' behalf, have in any way participated in the investigation, evaluation, adjusting or handling of the Claim. Please specify the nature of the participation for every such person.

**ANSWER**: See the response to interrogatory number 2.

LEGAL\76924614\1

6.  Please provide the following information regarding external communication, not Defendant's internal communications, made or received with respect to the Claim:

    a.  Identify the date(s) of every external communication made by Defendant regarding the Claim by listing the date, the person making the communication, the form of the communication (email, phone, letter, etc.), and to whom the communication was directed.

        **ANSWER**: See the documents that were previously produced to the Plaintiff on January 29, 2024 and on March 12, 2025, as the answer to this interrogatory can be ascertained by reviewing said documents.

    b.  Identify the date(s) of every external communication received by Defendant regarding the Claim by listing the date, the person making the communication, the form of the communication (email, phone, letter, etc.), and to whom the communication was directed.

        **ANSWER**: See the documents that were previously produced to the Plaintiff on January 29, 2024 and on March 12, 2025, as the answer to this interrogatory can be ascertained by reviewing said documents.

7.  For each pled affirmative defense please specifically describe and list each witness or person with personal knowledge of the factual basis for each defense, list and specifically describe the factual basis that each witness or person with personal knowledge that Defendant will present to provide the pled defense, identify and list every document, photograph, tangible or electronically stored date that the Defendant relies upon to plead or that it will rely on to prove the pled defense, and identify with specificity any and all documents, photographs, or electronically stored data that Defendant reviewed or relied upon to answer this interrogatory.

    **ANSWER**: Westchester's corporate representative(s) have knowledge and can testify as to the affirmative defenses pled in the Answer and Affirmative Defenses. Additionally, Dan Evans from Crawford has knowledge and can testify as to the coinsurance penalty that was applied. Westchester reserves the right to amend and/or supplement this response as discovery is ongoing.

## VERIFICATION PAGE

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY

Signed by:

*Rebecca E. Viola*

991211C515CB421

Signature

Printed Name: Rebecca Viola

Title: Claims Supervisor

STATE OF PA _____ )
                          ) ss:
COUNTY OF Philadelphia _____ )

SWORN TO and SUBSCRIBED before me by Rebecca Viola _____, who is personally known to me or who has produced a Georgia driver's license as identification, and who did/did not take an oath and verified that the foregoing Answers to Interrogatories are true and correct.

DATED this 8th day of May _____, 2025.

Commonwealth of Pennsylvania - Notary Seal
Theresa Witherup, Notary Public
Philadelphia County
Commission Number 1404016
My Commission Expires Sep. 13, 2025

NOTARY PUBLIC, State of Pennsylvania

_____

Signature of Notary Public

Theresa Witherup

(Print, Type or Stamp Commissioned Name of Notary Public)

My commission expires: 09/13/2025

5

# EXHIBIT

# F

1    report.  We've reviewed all four, right?

2        A.   We've reviewed all four.  I don't know if

3    there -- I believe there's a co-insurance calculation

4    attached.

5        Q.   I'm not asking about your math.  I'm asking

6    about the Policy provision explaining on how to do it.

7        A.   Okay.  Fair enough.  Okay.

8        Q.   Okay.  The provision, word for word, does not

9    appear in your Report in 1 through 4, correct?

10       A.   No.

11       Q.   Okay.  So it says, "If a co-insurance

12   percentage is shown in the Declarations, the following

13   condition applies."  And you wrote in your Report that

14   there's a 90 percent co-insurance percentage for this

15   claim -- for this Policy, correct?

16       A.   Correct.

17       Q.   Okay.  Now, "A, we will not pay the full

18   amount of any loss if the value of covered property at

19   the time of the loss times the co-insurance percentage

20   shown for it in the Declarations is greater than the

21   limit of insurance for the property."  So the first step

22   of this is, you have to determine the value of covered

23   property at the time of the loss.  How did you determine

24   the value of the property at the time of the loss?

25       A.   We utilized Xactimate for the valuation.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

381838 Evans Daniel 05-13-2025          Page 146

1    Q.   Right.  But at -- the value at the time of the

2    loss would have to take into consideration the age of

3    the materials and the condition, right?

4    A.   On an actual cash value basis.

5    Q.   Yeah.  That's what this says.  At the time of

6    the loss, you have to value -- the value of the property

7    is the covered property at the time of loss, which

8    would --

9    A.   Okay.

10   Q.   You would have to factor in the value of the

11   property in its current condition when the claim occurs?

12        MR. GARRIDO:  Object to form.

13        THE WITNESS:  (No verbal response.)

14        BY MR. MILLARD:

15   Q.   Is that a -- is that a yes?

16   A.   I'm sorry.  That I would have to value the

17   property at -- I'm sorry, please repeat.

18   Q.   Yeah.  When you value -- when you come up with

19   a valuation of the property, the Policy says, "We will

20   not pay the full amount of any loss if," and then it

21   says, "the value of covered property at the time of loss

22   times the co-insurance percentage shown for it in

23   Declarations is greater than the limit of insurance for

24   the property."  So you've got several things that you

25   have to consider to determine if the co-insurance

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    penalty applies.  The first, you have to figure out the

2    value of covered property at the time of loss.  That's

3    the first thing you have to figure out based on what the

4    policy says, correct?

5        A.    Yes.

6        Q.    Okay.  The value of covered property at the

7    time of loss is the value when you factor in the age and

8    condition of the building materials?

9            MR. GARRIDO:  Object to form.

10           THE WITNESS:  That's all -- that was all

11       generated in the Valuation Report, utilizing the

12       data that we researched on the county website.

13           BY MR. MILLARD:

14       Q.    No, that's not what I'm asking you.  But

15    unless you're answering -- unless you're telling me that

16    when I created the valuation, I provided an actual cash

17    value for the building.

18           MR. GARRIDO:  Object to form.

19           BY MR. MILLARD:

20       Q.    Is that what you're saying is that you did

21    provide Westchester with a --

22       A.    We created -- we created a valuation.

23       Q.    Right.

24       A.    So we -- we created a value of the property at

25    the time of loss.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    I get it.  One of your valuations was

2   replacement cost value?

3    A.    Correct.

4    Q.    The other valuation was actual cash value?

5    A.    Correct.

6    Q.    And those are stated in your report, right?

7    A.    It's our valuation, correct.

8    Q.    Okay.  And just so we're clear, I'm going back

9   to Plaintiff's 2, and I'm on Page 8 of 61 of what's been

10  marked as Plaintiff's 2.  And on Page 8, you have

11  "Estimated Replacement Cost" and "Actual Cash Value" for

12  the valuation of the building.

13    A.    Correct.

14    Q.    And the value of the building on the date of

15  loss, factoring in its age and condition, would be the

16  actual cash value amount of $614,993.46, correct?

17          MR. GARRIDO:  Object to form.

18          THE WITNESS:  Yes.

19          BY MR. MILLARD:

20    Q.    I'm sorry, what was that, sir?  Is that a yes?

21    A.    Yes.

22    Q.    Okay.  The estimated replacement cost would be

23  the value that you would incur if you actually rebuilt

24  the structure?

25    A.    That's the estimated replacement cost.

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       Q.   Okay.  Replacement cost is actually when you

 2   rebuild it.  That's the amount that you've estimated

 3   would be incurred.  But before you got started, the

 4   amount that -- the value of the building at the time of

 5   the loss was $614,993.46?

 6       A.   That would be the actual cash value.

 7       Q.   Okay.  And that would be the value of the

 8   building on the date of loss?

 9            MR. GARRIDO:  Object to form.

10            THE WITNESS:  I don't know if that -- I -- I

11       can't speak to the value.  I can only speak to the

12       information I have.  So --

13            BY MR. MILLARD:

14       Q.   I don't understand what you're saying.

15       A.   Well, you're asking --

16       Q.   Information -- the first of the --

17       A.   You're asking the value.

18       Q.   Hold on just a minute.  Hold on.  The

19   information you have -- and so we got where we were

20   after I laid the foundation to get there.

21            And the foundation that I laid to get there,

22   and you agreed, is that the value of covered property at

23   the time of the loss is the value of the property when

24   you consider its age and condition?

25       A.   That's the valuation tool available.  Yes,
```

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    that is correct.

2        Q.   All right.  So --

3        A.   That is -- that is what -- based on Xactimate.

4        Q.   Right.  Right.  I -- I'm not beating you up on

5    the number.

6        A.   Okay.

7        Q.   I -- I'm -- I get it that the number -- you

8    have numbers.  We've talked about how you got those

9    numbers.  But I'm talking about what the Policy says,

10   and what was recommended.  So you made recommendations

11   according to the assignment that Westchester gave you

12   telling you how to value, what value to use for co-

13   insurance, correct?

14       A.   That was the task, yes.

15       Q.   Right.

16       A.   That I was --

17       Q.   But when we review the Policy language, the

18   Policy says, "The value of covered property at the time

19   of the loss," which would mean that the value you should

20   start with is the actual cash value figure of

21   $614,993.46?

22            MR. GARRIDO:  Object to form.

23            THE WITNESS:  If you go to actual cash value,

24        then we would talk actual cash value on the repair

25        itself.  Can't compare actual cash value to

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

1    replacement cost.

2         BY MR. MILLARD:

3    Q.    I don't know -- I don't know what you're

4    answering.  That's nonresponsive.

5    A.    For -- for the -- the number from -- well, if

6    we're talking about the value as depreciated, then it's

7    got to coincide with the depreciated value of the

8    repair.  You can't give -- compare the actual cash value

9    to the replacement cost.

10   Q.    I'm sorry, but --

11   A.    You can't do it.

12   Q.    Just a minute here.  At this point, I -- we --

13   at this point, for this line of questioning, I accept

14   that you used Xactimate.  I'm not questioning that

15   that's how we got here.  I'm not questioning whether you

16   wrote in the right age of the building or not.  None of

17   that's in question.

18         At the end of the day, on October 19th of

19   2022, you provided Westchester with a report.  And in

20   that Report, you determined two different numbers.  You

21   determined based on what Xactimate said the value of the

22   building would be on a replacement cost value.  And you

23   also determined the value of the building on an actual

24   cash value basis, correct?

25   A.    The repairs were considered on an actual cash

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  value basis.

 2      Q.   I'm sorry, sir.  But do you see the document

 3  on the share screen?

 4      A.   I see the valuation.

 5      Q.   Okay.  The top -- so on Page 8 of 61, what's

 6  been marked as Plaintiff's 2 --

 7      A.   That was the -- that estimated replacement

 8  cost, and it was --

 9      Q.   Sir, let me finish my question before you

10  start talking, please.  And listen closely, sir.

11      A.   Okay.

12      Q.   This isn't that hard.  I mean, we've all --

13  you -- to a certain degree, you've already agreed to

14  some of this stuff.  So I'm just trying to understand

15  what the -- what the -- what the difficulty is.  But

16  let's just -- let's look at what's on the screen.  When

17  you created the valuation of the building, the valuation

18  you provided to Westchester included two different

19  valuations.  The first valuation was the replacement

20  cost value.  The second valuation, appearing just below

21  that, was the actual cash value.  Do you see that?

22      A.   Those are the two values provided.  Yes.

23      Q.   Right.  And then in parentheses, it said,

24  "(Replacement cost includes all applicable permit fees,

25  overhead, profit, and sales tax)," right?

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

381838 Evans Daniel 05-13-2025          Page 153

1      A.   Yes.

2      Q.   And you would have to do the work to know what

3   that would cost and to recover it under a -- under

4   Replacement Cost Value, correct?

5      A.   Yes.

6      Q.   Okay.  So the replacement cost value would

7   contemplate that all of the repairs for the building to

8   create it back with all the properly considered

9   valuation points on a replacement cost value basis would

10  be $1,078,750.66?  $1,078,750.66.  That's the amount you

11  factored in to -- if you had to pull all the permits and

12  you incurred overhead and profit and the sales tax, and

13  buying all brand new materials and built this building

14  back, that's how much the system determined or that you,

15  using the system, determined the replacement cost value

16  of the Boomer's building would cost, right?

17     A.   Xactimate generated that number, yes.

18     Q.   I understand that.

19     A.   Okay.  So --

20     Q.   And Xactimate, based on the information you

21  input, also determined that on the date of loss, before

22  you've done all the repairs, bought new materials, and

23  incurred permitting fees, overhead and profit, et

24  cetera, et cetera, on the date of the loss and in the

25  condition you observed the building, the actual cash

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

381838 Evans Daniel 05-13-2025          Page 154

```
 1  value, when you factor in actual cash value equals

 2  replacement cost less depreciation, so you depreciate

 3  the replacement cost to factor in what the value of the

 4  building was on the date of the loss, that amount that

 5  you included in your Report is $614,993.46, correct?

 6      A.   That's what the system generated, correct.

 7      Q.   Okay.  And so on -- the value of covered

 8  property at the time of the loss was $614,993.46,

 9  correct?

10          MR. GARRIDO:  Object to form.

11          THE WITNESS:  That is the actual cash value

12     based on the age, based on the input to the

13     estimating valuation tool.

14           BY MR. MILLARD:

15      Q.   Okay.

16          MR. MILLARD:  And what's the basis of your

17     objection, Juan?

18          MR. GARRIDO:  I'm sorry?

19          MR. MILLARD:  What's the basis of that

20     objection, sir?

21          MR. GARRIDO:  You're -- it's asked and

22     answered.  You're badgering the witness.

23          MR. MILLARD:  Okay.

24          MR. GARRIDO:  I mean, you've asked him the same

25     question, like, seven times.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        MR. MILLARD:  All right.

 2        MR. GARRIDO:  And he's already answered the

 3   question.

 4        MR. MILLARD:  All right.  So you agree that

 5   this witness has provided that the value of the

 6   building on the time of the loss is $614,993.46?

 7        MR. GARRIDO:  No.  I -- that's why I'm

 8   objecting.

 9        MR. MILLARD:  Okay.  All right.  Because that's

10   why -- I had to clarify his testimony.  That's why I

11   re-asked him several times, but I appreciate that.

12        MR. GARRIDO:  And just for the record, I don't

13   agree to that.  You're putting words in my mouth.

14        MR. MILLARD:  I -- you don't have to agree. If

15   you agreed, we wouldn't be sitting here right now.

16        MR. GARRIDO:  Clearly.

17        MR. MILLARD:  Okay.  Clearly.

18         BY MR. MILLARD:

19    Q.   Mr. Evan, are you aware of any other provision

20   in the Policy that explains how you or Westchester was

21   supposed to value the property to calculate co-

22   insurance?

23    A.   Mr. Millard, my name is Evans, just to be

24   clear.

25    Q.   Okay.  Mr. Evans.
```

**MILESTONE │ REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**